895 F.Supp. 1298 (1995)
Reginald L. POWELL, Petitioner,
v.
Michael S. BOWERSOX,[1] Respondent.
No. 91-1370C(8).
United States District Court, E.D. Missouri, Eastern Division.
August 15, 1995.
*1299 *1300 *1301 *1302 Thomas A. Ludwig, Stephen C. Wilson, Buerkle and Beeson, Jackson, MO, for petitioner Reginald L. Powell.
Millie E. Aulbur, Stacy L. Anderson, Assistant Attorneys General, Jefferson City, MO, for defendant Paul K. Delo, Superintendent.

ORDER
STOHR, District Judge.

I. INTRODUCTION
This matter is before the Court on the petition of Missouri State prisoner Reginald L. Powell, for a writ of habeas corpus pursuant to 28 U.S.C.  2254. After exhausting his available state law remedies, either by fairly presenting his claims to the Missouri courts or because he is now procedurally barred from doing so, petitioner initiated this action following his conviction in the Circuit Court of the City of St. Louis on two counts of first degree murder and a sentence of death. R.S.Mo.  565.020. Petitioner asserts twelve grounds for relief, many of which contain several subparts. The petition was filed July 5, 1991 and assigned to the Honorable Stephen N. Limbaugh. Subsequently, on June 21, 1994, Judge Limbaugh determined that a conflict of interest had arisen, necessitating his recusal from this case. On September 6, 1994, this matter was reassigned to this Court.

II. PROCEDURAL BACKGROUND
Petitioner was arrested on November 26, 1986 and charged by indictment with two counts of first degree murder, two counts of robbery and one count of armed criminal action. Resp.Exh. B, pp. 362-63. On March 21, 1988, the trial commenced. After seven days of trial, the jury found petitioner guilty on Counts I and II, but could not agree on the punishment.[2] Resp.Exh. B, pp. 105-06. Pursuant to R.S.Mo.  565.030, the trial court is empowered to assess and declare punishment if the jury is unable to agree on punishment. Accordingly, on April 11, 1988, the trial judge notified both parties that on April 15, 1988 he would enter his decision assessing punishment. On April 15, the trial judge found, by a preponderance of the evidence, that (1) the murder of each victim was "committed while the [petitioner] was engaged in the commission of another unlawful homicide;" (2) the murders "involved torture and/or depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible or inhumane;" and (3) the murders were "committed while [petitioner] was engaged in the perpetration or attempted perpetration of [a] robbery." Resp.Exh. B, pp. 100-01. Based on these findings, the trial court assessed and declared punishment on both Counts I and II at death. Resp.Exh. B, pp. 100-01.
Petitioner filed a motion for a new trial on April 19, 1988. That motion contains seventy-two points, with several subpoints, as alleged assignments of error. See generally Resp.Exh. B, pp. 59-99. The trial judge called petitioner's motion for a new trial for hearing, considered the motion, and, on April 29, 1988, denied the motion on its face. That same day, the trial judge formally entered a judgment against petitioner, sentencing him to death on both Counts I and II. Resp.Exh. B, p. 38. A Warrant of Execution was issued at that time. Resp.Exh. B, p. 39.
On May 10, 1988, petitioner filed his notice of appeal to the Supreme Court of Missouri. Resp.Exh. B, p. 29. Additionally, on December 1, 1988, petitioner filed a pro se motion pursuant to Missouri Supreme Court Rule 29.15.[3] The Missouri Supreme Court held *1303 petitioner's appeal in abeyance, pending a ruling on his 29.15 motion. On February 21, 1989, with the assistance of appointed counsel, petitioner filed an amended 29.15 motion. The circuit court conducted a four-day evidentiary hearing, which began on April 7, 1989. On October 13, 1989, the Court denied the motion for post-conviction relief.
Petitioner then appealed the denial of his 29.15 motion. The Missouri Supreme Court consolidated petitioner's appeals, and on November 20, 1990, the Missouri Supreme Court, en banc, affirmed the judgment of conviction, the sentence of death, and the denial of post-conviction relief. State v. Powell, 798 S.W.2d 709 (Mo. banc 1990). In so doing, the Missouri Supreme Court stated that:
[M]any of the contentions and allegations in the pretrial motions, motion for new trial, and brief herein, ignore decisions of this Court which have repeatedly rejected the same arguments. The Court suggests that the scatter-load attacks do not comport with the rules of this Court and tend to obfuscate the ultimate issue of appellate review, namely, whether defendant received a constitutionally mandated fair trial free of reversible error.
Petitioner filed a Petition for Writ of Certiorari in the United States Supreme Court on April 30, 1991. The Supreme Court denied the petition on June 28, 1991. Petitioner then filed a pro se petition for a writ of habeas corpus in this Court on July 5, 1991. By order dated July 8, 1991, the Court stayed petitioner's execution, pending a ruling on his habeas petition. On September 6, 1991, the Court appointed petitioner counsel, and petitioner's appointed counsel filed an amended petition on August 18, 1992.

III. FACTS
The facts of this case are as follows. On the evening of November 14, 1986, petitioner was drinking with some friends at a house located in the City of St. Louis. After a short period, petitioner and three others went to a liquor store, where they encountered Freddie Miller and his brother, Lee Miller. Petitioner asked the Miller brothers to purchase liquor for them, as petitioner and his companions were all age eighteen or younger. After some argument, the Millers refused the request.
Later that evening, still hoping to procure some liquor, petitioner and his friends went to the apartment of another friend. One of the Millers also happened to live in that apartment building. When petitioner and his friends arrived at the building, they again encountered the Millers. The Miller brothers were in the backyard talking to another person, Calvin Courtney. Both of the Miller brothers were intoxicated, one so much so that he had difficulty standing.
Petitioner and his friends again began to argue with the Millers. Eventually, a fight erupted. Because the victims were both very intoxicated, they were quite defenseless and easily fell to the ground. While the victims were on the ground, petitioner kicked and stomped on them repeatedly. Petitioner pulled down the pants and undershorts of one of the victims and began kicking him in the genitals. Petitioner's friends eventually joined in, beating the victims with bricks, boards and branches.
After the others stopped beating the victims, petitioner jumped up and down on the chests of both victims, breaking all but the top ribs of each. Petitioner and his friends then searched the victims' cloths, recovering three dollars and a pack of cigarettes. Petitioner's friends then left, leaving petitioner alone with the victims.
As the two victims lay in the backyard, still alive, petitioner stabbed each of them three times in the chest and abdomen. One of the Miller brother's sustained a wound to his hand consistent with an effort to defend himself. An autopsy revealed that both victims sustained multiple stab wounds approximately five to six inches in depth. Both victims died from internal bleeding secondary to the multiple stab wounds.
*1304 After stabbing both victims to death, petitioner rejoined his friends. He cleaned the blade of his knife by sticking it in the ground. However, he still had blood on his shoes. Petitioner boasted to his friends that he had stabbed the victims.
Petitioner was arrested the next day, after Courtney spoke to police officers. Officers read petitioner his Miranda rights, and petitioner then proceeded to make a statement: "You know, we'll say I had the last ÔÇö the last laugh."

IV. EVIDENTIARY HEARING
In conjunction with the filing of his amended petition, petitioner filed a motion for an evidentiary hearing. Following the United States Supreme Court's decision in Keeney v. Tamayo-Reyes, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), the Eighth Circuit set forth the standards to apply in considering the necessity of an evidentiary hearing in the context of a habeas petition:
Now, under Keeney, in order for a petitioner to be entitled to an evidentiary hearing in federal district court, petitioner must show both cause for his failure to adequately develop the facts material to his [claims] in the postconviction state court hearing and actual prejudice resulting therefrom; alternatively, petitioner must show that a fundamental miscarriage of justice would result from the denial of an evidentiary hearing in federal court. Id. at 9-13, 112 S.Ct. at 1720-21. In order for us to find that a fundamental miscarriage of justice would result from denial of an evidentiary hearing in federal court, petitioner must demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray v. Carrier, 477 U.S. 478, 496, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986).
McCann v. Armontrout, 973 F.2d 655, 658 (8th Cir.1992).
In his motion, petitioner asserts that an evidentiary hearing is required to (1) "determine the amount of the significant involvement" between petitioner and his appointed counsel and (2) to facilitate the introduction of the testimony of a neuropharmacologist. While the Court is cognizant of the scope of its power to hear evidence in a habeas corpus proceeding, see, e.g., Townsend v. Sain, 372 U.S. 293, 312, 83 S.Ct. 745, 756-57, 9 L.Ed.2d 770 (1963), especially in a capital case, see Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991-92, 49 L.Ed.2d 944 (1976), upon consideration of the petitioner's motion, and applying the most recent standards set out by the Eighth Circuit, the Court finds that petitioner has failed to demonstrate the necessity of such a hearing in this case.
First, with regard to the relationship between petitioner and his counsel, the record contains abundant evidence of the extent of that relationship, assuming that the "amount of significant involvement" even bears on the question of whether "a constitutional violation has probably resulted in the conviction of one who is actually innocent." See, Murray, 477 U.S. at 496, 106 S.Ct. at 2649. Further, the Court finds that petitioner has failed to establish cause and prejudice for his failure to adequately develop the material facts, upon which he now seeks to offer evidence, at the state court hearing.
Petitioner fails to establish cause because he has not alleged that "some objective factor external to the defense impeded counsel's efforts to raise the claim in the state court." McCleskey v. Zant, 499 U.S. 467, 493-94, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991). Certainly all facts relevant to petitioner's relationship with his appointed trial counsel were known both to him and his trial counsel prior to the initiation of his postconviction hearings. Petitioner also fails to show prejudice resulting from his failure to adequately develop the facts material to his claims. The evidence, were it developed, would indicate that petitioner's trial counsel drafted petitioner's motion for a new trial and his pro se 29.15 motion. Clearly, petitioner's appointed counsel, who apparently had strong personal feelings for petitioner, zealously pursued available avenues of postconviction relief. Consequently, the Court is not persuaded that additional evidence on the nature and extent of petitioner's relationship with his appointed counsel would impact the Court's analysis of the instant petition.
*1305 Second, with regard to the issue concerning the testimony of a neuropharmacologist, the Court finds that an evidentiary hearing is unnecessary. On August 18, 1992, petitioner filed an "Ex Parte Motion for Funds For Investigative And Expert Services." Specifically, petitioner sought funds to engage a neuropharmacologist. By order dated January 25, 1993, Judge Limbaugh directed petitioner to show cause why his motion should be granted. Petitioner never responded to the order. Therefore, on August 2, 1993, Judge Limbaugh denied the motion.
The Court presumes from petitioner's failure to responded to Judge Limbaugh's "Show Cause" order that either no new evidence was adduced or that this ground had been abandoned. Thus there is no apparent need for an evidentiary hearing on this claim and the request for a hearing will be denied.

V. ANALYSIS
A federal court reviewing a state conviction in a 28 U.S.C.  2254 proceeding may consider only those claims which the petitioner has presented to the state court in accordance with state procedural rules. Gilmore v. Armontrout, 861 F.2d 1061, 1065 (8th Cir.1988), cert. denied, 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989). This requirement implicates both the question of whether petitioner has exhausted all remedies available in the state court (i.e. the exhaustion requirement), and whether he has preserved his claims for federal habeas corpus review by complying with state procedural rules governing their presentation (i.e. the procedural default inquiry). Id. The question of whether a claim is procedurally barred is distinct from the inquiry concerning whether a claim has been exhausted. Satter v. Leapley, 977 F.2d 1259, 1261 (8th Cir.1992). However, a federal court may entertain a claim which has been procedurally defaulted in the state courts, if petitioner demonstrates adequate cause to excuse his state court default, as well as resulting prejudice from the default, or shows that a fundamental miscarriage of justice would occur if the federal court declined to consider his claims. Coleman v. Thompson, 501 U.S. 722, 752, 111 S.Ct. 2546, 2566, 115 L.Ed.2d 640 (1991); Wainwright v. Sykes, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506-07, 53 L.Ed.2d 594 (1977). Failure to satisfy the procedural default analysis mandates rejection of that particular ground. Rose v. Lundy, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

A. GROUND I: Due Process Deprivation ÔÇö Appointment of Counsel
As his first asserted ground for relief, petitioner alleges that his due process rights were violated because "the State appointed counsel for petitioner, and that said counsel's judgment was clouded and petitioner was not allowed by counsel to testify, and that counsel was ineffective." Amended Petition, p. 8. At bottom, petitioner claims that the personal and eventually intimate relationship which evolved between him and his appointed counsel led to a deprivation of his due process rights in that his counsel did not "allow" him to testify. Petitioner asserted this ground in his 29.15 motion, see Resp.Exh. D, pp. 75-76, and on appeal from the denial of his 29.15 motion. See Resp.Exh. E, p. 64.
The Court, as did respondent, construes this as a claim of ineffective assistance of counsel. Such claims are governed by Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in which the United States Supreme Court articulated a two-part test for resolving such challenges. First, petitioner must demonstrate that his attorney's representation fell below an objective standard of reasonableness under the circumstances. Second, petitioner must establish that the alleged error was so prejudicial that there is a reasonable probability it would have changed the result of his trial. This two-fold showing is required to over-come the strong presumption that counsel rendered constitutionally sufficient representation. Beans v. Black, 757 F.2d 933, 936 (8th Cir.), cert. denied, 474 U.S. 979, 106 S.Ct. 381, 88 L.Ed.2d 334 (1985). Finally, in a federal habeas proceeding, ineffective assistance of counsel is a mixed question of fact and law. Thus this Court is required to conduct a de novo review of the state court's legal conclusions on the issue of the effectiveness of counsel's representation. However, a state court's specific factual findings made in *1306 the course of deciding an ineffectiveness of counsel claim are presumed correct pursuant to 28 U.S.C.  2254(d), if fairly supported by the record. Sumner v. Mata, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); Laws v. Armontrout, 863 F.2d 1377, 1381 (8th Cir. 1988), cert. denied, 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 415 (1989).
Upon examination of the record, the Court is left with the firm conviction that counsel's performance was not defective. Petitioner contends that he had a right to testify at his trial and that in advising him not do to so, petitioner's appointed counsel rendered ineffective representation. In support of this contention, petitioner restates many of the facts of the case which presumably support his position that he had a significant incentive to testify in his own defense. Petitioner also alleges that the attorney from the public defender's office who "second-chaired" the trial disagreed with lead-counsel's decision to advise petitioner not to testify.
Neither of these arguments are persuasive. To the contrary, they both support a finding that the decision of whether petitioner should testify was a "strategic choice." In questioning the attorney who "second chaired" the trial, petitioner's 29.15 counsel characterized the decision to advise petitioner not to testify as a "strategic choice." Resp.Exh. C, p. 196. Further, the testimony adduced at the 29.15 hearing reflects the bases for a strategic decision to recommend to petitioner that he not testify. Resp.Exh. C, p. 196. Petitioner's lead trial counsel was concerned that if petitioner testified he might "come out too well, too intelligent, too mentally capable." Amended Petition, p. 12, Resp.Exh. C, p. 196.
At most, petitioner alleges a disagreement between the two attorneys who represented him at trial as to whether petitioner should testify. Counsel's advice that petitioner not testify simply does not constitute constitutionally inadequate representation "when it might be considered sound trial strategy." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065.
Petitioner also contends that he was not advised that he had a constitutional right to testify even if his trial counsel advised against it. Resp.Exh. C, p. 203-05. However, petitioner concedes that on at least two occasions he did discuss with his trial counsel whether he should testify. Resp.Exh. C, pp. 203-04. Petitioner also recalls the reasons why his trial counsel advised against his testifying. Further, petitioner has not directed this Court to any authority which supports the finding of a constitutional obligation on the part of counsel to advise a criminal defendant of his right to testify notwithstanding advice from counsel to the contrary.
In support of his ineffective assistance of counsel claim, petitioner also offers a "cumulative error" argument. Petitioner argues that the decision to advise petitioner not to testify, when viewed in conjunction with "the decision to have sex with a client during or shortly after a capital murder trial," was one of a series of decisions, which militate in favor of granting the writ. This assertion is also not persuasive. The two "decisions" are completely unrelated. Further, it is not clear how, if at all, one decision impacted the other.
Finally, the Court notes that the evidence offered in support of this ground, romantic letters sent to petitioner by his trial counsel, were never presented to the Missouri courts. This Court will not consider evidence in support of an allegation presented in a federal habeas petition if that evidence was not first presented to the state courts, unless petitioner can satisfy the cause and prejudice analysis or show that a fundamental miscarriage of justice would occur. Keeney v. Tamayo-Reyes, 504 U.S. 1, 11-13, 112 S.Ct. 1715, 1721, 118 L.Ed.2d 318 (1992). Petitioner does not do either here and thus is arguably barred from presenting that evidence to this Court. Further, petitioner fails to cite a single case in which an attorney's personal relationship with her client constituted per se ineffective assistance of counsel. Quite to the contrary, such a relationship arguably provides the impetus for counsel to strive to provide her client with the best representation she is capable of.
The Court finds that this ground is without merit and that the evidence offered in support of this ground is arguably procedurally barred. Therefore, all relief based on *1307 Ground I of petitioner's amended petition will be denied.

B. GROUND II: Eighth Amendment Violation ÔÇö Failure to Instruct Jury on All Statutory Mitigating Circumstances.
In Ground II of his amended petition, petitioner alleges that his right to be free from cruel and unusual punishment under the Eighth Amendment was violated when the trial court refused to submit instructions on all the statutory mitigating circumstances supported by the evidence. Amended Petition, p. 22. Specifically, petitioner argues that the jury should have been instructed on two additional mitigating circumstances: (1) "The murder in the first degree was committed while the defendant was under the influence of extreme mental or emotional disturbance," R.S.Mo.  565.032.3(2); and (2) "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." R.S.Mo.  565.032.3(6). Petitioner offered jury instructions pertaining to both of these mitigating circumstances, but they were refused. Resp.Exh. B, pp. 121-23. Petitioner pursued this ground in his motion for a new trial, Resp.Exh. B, pp. 86-88, and on direct appeal. Resp.Exh. E, p. 74.
Missouri law provides, in relevant part, that:
In all cases of murder in the first degree for which the death penalty is authorized, the judge in a jury waived trial shall consider, or he shall include in his instructions to the jury for it to consider:
(2) Any of the statutory mitigating circumstances enumerated in subsection 3 which are requested by the defendant and supported by the evidence.
R.S.Mo.  565.032.1. If the jury finds that one or more mitigating circumstances exist and that the mitigating circumstance(s) outweigh the aggravating circumstance(s), the jury must return a verdict fixing punishment at life imprisonment without the possibility of parole, as opposed to death. R.S.Mo.  565.030.4(3).
Petitioner's trial counsel offered instructions on both the "mental and emotional disturbance" circumstance and the "capacity to appreciate" circumstance. The trial judge refused to offer those instructions, concluding that neither instruction was supported by the evidence. Resp.Exh. A, Vol. IV, pp. 1273-75. Petitioner argues that these instructions were supported by the evidence. Specifically, petitioner cites this Court to the Missouri Supreme Court opinion in this case which noted that petitioner had been drinking the night of the crime, that he had an Intelligence Quotient ("I.Q.") of between 65 and 83, and that evidence was offered on the question of whether petitioner "did or did not have a state of mind which is an element of the offense." Powell, 798 S.W.2d at 711, 712, 713. Petitioner also cites the trial testimony of Dr. Lynn McLaughlin, Director of Psychological Services at Malcolm Bliss Mental Health Center ("Malcolm Bliss"), who opined that petitioner was not the type of individual who would "coolly reflect" before acting. Resp.Exh. A, Vol. IV, p. 1062. Dr. Dean Rosen, a clinical psychologist at Malcolm Bliss, offered similar testimony about impairments in petitioner's judgment, decision making and problem solving processes. Resp. Exh. A, Vol. IV, pp. 1103-04. Based on this testimony, petitioner argues that the record supported submitting the two additional mitigating circumstances to the jury.
The Court is not persuaded that the record adequately supported the submission of the two mitigating circumstances instructions sought by petitioner. The trial judge heard evidence that petitioner was able to distinguish between right and wrong, Resp.Exh. A, Vol. IV, p. 1116, and that petitioner did not suffer from a "mental disease or defect excluding responsibility." Resp.Exh. A, Vol. IV, p. 1142. Based on this evidence, he concluded that the evidence failed to support the submission of these two mitigating circumstance instructions.
Further, the Missouri Supreme Court found, as did the trial court, that the facts did not support submitting the two mitigating circumstances instructions to the jury. Powell, 798 S.W.2d at 714. Based on the record, this Court, consistent with the Missouri courts, concludes that the evidence was insufficient to warrant the submission of *1308 these two mitigating circumstances instructions to the jury. Cf. Sumner v. Mata, 449 U.S. at 547, 101 S.Ct. at 769.
In addition, jury instruction numbers thirty-one and thirty-six explicitly instructed the jury that it could consider "[w]hether the defendant had a mental disease or defect at the time of the murder[s]...." Therefore, the jury was permitted to consider petitioner's mental state at the time of the crime as a mitigating circumstance. For these reasons, the Court finds Ground II to be without merit and relief based on that ground will be denied.

C. GROUND III: Instruction on Mitigating Circumstances
In his next ground for relief, petitioner claims that his constitutional rights were violated because the "court's capital sentencing instructions required a unanimous finding on mitigating circumstances before those circumstances could be weighed against the aggravating circumstances." Amended Petition, p. 26. Petitioner claims that the challenged instructions violate the principles set forth in Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) and McKoy v. North Carolina, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). This ground was first asserted in petitioner's motion for a new trial. Resp. Exh. B, p. 87. It was not asserted in petitioner's 29.15 motion. See generally Resp. Exh. D. However, it was asserted on direct appeal from the denial of the new trial motion. Resp.Exh. E, p. 74.
In Mills, the Supreme Court concluded that a remand for resentencing was necessary because a substantial probability existed that jurors thought they were precluded from considering any mitigating evidence unless they unanimously agreed on the existence of a particular mitigating circumstance. Mills, 486 U.S. at 379, 108 S.Ct. at 1867-68. Similarly, in McKoy, the Supreme Court stated that individual jurors could not be precluded from considering any mitigating circumstances merely because the jury could not unanimously agree on the existence of that circumstance.
The relevant part of jury instruction number thirty-one charged:
If you unanimously find that one or more mitigating circumstances exist sufficient to outweigh the aggravating circumstances found by you to exist, then, on Count I you must return a verdict fixing defendant's punishment at imprisonment for life by the Division of Corrections without eligibility for probation or parole.
Jury instruction number thirty-two charged:
As to Count I, you are not compelled to fix death as the punishment even if you do not find the existence of one or more mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances which you find to exist. You must consider all the circumstances in deciding whether to assess and declare the punishment at death. Whether that is to be your final decision rests with you.
Instruction numbers thirty-six and thirty-seven are essentially identical but apply to Count II.
In contrast, the jury instructions in Mills mandated that jurors unanimously agree upon a mitigating circumstance or circumstances. The instructions submitted here did not require the jurors to unanimously agree on any particular mitigating factor, as in Mills, but rather, instructed the jurors that they must unanimously agree that the mitigating factors they found outweigh the aggravating factors, before a life sentence is mandated.
In considering a penalty of death, this Court finds that there was not a substantial probability that reasonable jurors thought, in the words of Mills, that "they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." Mills, 486 U.S. at 384, 108 S.Ct. at 1870. The challenged jury instructions do not violate Mills or McKoy and are not unconstitutional. See, e.g., Griffin v. Delo, 33 F.3d 895, 906-07 (8th Cir.1994). Therefore all relief on Ground III will be denied.

D. GROUND IV: Trial Court Error in Failing to Suppress and in Admitting Petitioner's Statement
In Ground IV, petitioner alleges that the trial court erred in overruling his motion to *1309 suppress statements that he made to the police after his arrest. Petitioner asserts that the statements should have been suppressed because his low intelligence, combined with his drug and alcohol use "made it impossible for him to have knowingly and voluntarily waived his [Miranda] rights." Amended Petition, p. 35. Petitioner asserted this ground in his motion for a new trial, Resp.Exh. B, pp. 1-2, in his 29.15 motion, Resp.Exh. D, p. 7, and on direct appeal. Resp.Exh. E, pp. 42-50.
Detective Gooch, the detective who arrested petitioner, read petitioner his rights from memory and then, after advising petitioner of his rights, asked petitioner if he understood those rights. Resp.Exh. A, Vol. III, p. 889. Petitioner indicated that he did understand his rights. Officers then took petitioner to an interview room at the police station. Before initiating discussions with petitioner, Gooch again advised petitioner of his Miranda rights. Again, petitioner indicated that he understood those rights. Following his assertion that he understood his constitutional rights, officers questioned petitioner about the two murders which he was ultimately convicted of.
Petitioner then advised officers that he wished to make a statement. Gooch placed a "Warning and Waiver Form" and a tape recorder in front of petitioner. Gooch read petitioner the form while petitioner followed along. After each right, petitioner was asked if he understood the right. Petitioner repeatedly reaffirmed his understanding of his rights. Petitioner then signed the waiver form and proceeded to make a statement. The Missouri courts found petitioner's waiver of rights to be knowing and voluntary and thus concluded that his statement was admissible.
The state urges this Court to accord the state courts' factual conclusions concerning the validity of petitioner's waiver of his Miranda rights a presumption of correctness, as required by 28 U.S.C.  2254(d). However, such deference is not appropriate here because the ultimate question of the validity of petitioner's waiver is "a legal question requiring an independent federal determination," Miller v. Fenton, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), and not an issue of fact to which a presumption of correctness would apply to a determination by a state court. Cf. 28 U.S.C.  2254(d). Additionally, the state trial court that heard Smith's suppression motion made no factual findings, explicit or implicit, about Smith's retardation or its effect on his capacity to waive his rights. See Townsend v. Sain, 372 U.S. 293, 313-14, 83 S.Ct. 745, 757-58, 9 L.Ed.2d 770 (1963) (state court must actually reach and decide issues of fact for presumption of correctness to apply). Consequently, the Court rejects the state's invitation and proceeds with its own analysis of this ground.
"Where a person convicted in a state court has not intelligently and understandingly waived the benefit of counsel and where the circumstances show that his rights could not have been fairly protected without counsel, the Due Process Clause invalidates his conviction...." Com. of Pennsylvania ex rel. Herman v. Claudy, 350 U.S. 116, 118, 76 S.Ct. 223, 224, 100 L.Ed. 126 (1956). Where the right to counsel is of such critical importance as to be an element of Due Process under the Fourteenth Amendment, a finding of waiver is not to be made lightly. Cf. Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); Glasser v. United States, 315 U.S. 60, 70, 62 S.Ct. 457, 464-65, 86 L.Ed. 680 (1942); Von Moltke v. Gillies, 332 U.S. 708, 723, 68 S.Ct. 316, 323, 92 L.Ed. 309 (1948).
In Johnson v. Zerbst, the Supreme Court held that although a criminal defendant in federal court is entitled to the benefit of counsel to secure the fair hearing guaranteed to him by the Fourteenth Amendment, that right to counsel could be waived. Further, the Supreme Court held that when a judgment of conviction entered in a federal court is collaterally attacked upon the ground that the petitioner did not have the benefit of counsel at trial, the petitioner has the burden of showing, by a preponderance of the evidence, that he did not intelligently and understandingly waive his constitutional right to the assistance of counsel. Johnson, 304 U.S. at 464, 58 S.Ct. at 1023; Moore v. Michigan, 355 U.S. 155, 161-62, 78 S.Ct. 191, 195-96, 2 L.Ed.2d 167 (1957). Whatever *1310 may be the differences in the substantive right to counsel in federal and state cases, when the defendant in a state case has established his constitutional right to the benefit of counsel, he carries the same burden of proving nonwaiver as is required of a defendant in a federal case. Moore, 355 U.S. at 161, 78 S.Ct. at 195. Therefore the rule of Johnson v. Zerbst applies in this case, and petitioner has the burden of showing, by a preponderance of the evidence, that the waiver of his right to counsel was not intelligently and understandingly made.
The United States Supreme Court has held that the inquiry into whether a defendant has waived his rights under Miranda voluntarily, knowingly and intelligently has two distinct dimensions:
First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.
Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); see Colorado v. Spring, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987); Evans v. McCotter, 790 F.2d 1232, 1238 (5th Cir.), cert. denied, 479 U.S. 922, 107 S.Ct. 327, 93 L.Ed.2d 300 (1986); United States v. McClure, 786 F.2d 1286, 1288-90 (5th Cir.1986). Thus "a valid waiver of Miranda rights must not only be voluntary; it must also be intelligently made." Miller v. Dugger, 838 F.2d 1530, 1538 (11th Cir.1988) (emphasis in original). Moreover, mental illness is a factor to be considered by the trial court when ruling on the validity of a waiver. Id. at 1539; see Cooper v. Griffin, 455 F.2d 1142, 1145 (5th Cir.1972); McClure, 786 F.2d at 1289.
Applying Burbine and Miller to the facts of this case, the Court finds that petitioner's waiver was both voluntary and intelligent. The state does not dispute the general proposition that a suspect's mental limitations can interfere with his capacity to make an intelligent waiver of the Miranda rights. However, the Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of his Fifth Amendment rights. Colorado v. Spring, 479 U.S. 564, 574, 107 S.Ct. 851, 857-58, 93 L.Ed.2d 954 (1986). Further, mental retardation does not, by itself, prevent a defendant from voluntarily waiving his constitutional rights. See Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).
The voluntariness of a Miranda waiver depends on the absence of police overreaching, and not on any broad sense of "free choice." Connelly, 479 U.S. at 167, 107 S.Ct. at 521-22; see United States v. Scheigert, 809 F.2d 1532, 1533 (11th Cir.1987). To be a knowing and voluntary waiver the suspect must have understood the warnings: "that he at all times knew that he could stand mute and request a lawyer, and that he was aware of the state's intentions to use his statements to secure a conviction." Moran v. Burbine, 475 U.S. 412, 422, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). Petitioner does not argue that his confession was involuntary due to any police overreaching or coercion. Further, petitioner was advised at least three times either in writing or orally that he could "stand mute." Petitioner expressly indicated his understanding of that right and elected to make a statement anyway. In light of the record, the Court finds that petitioner's waiver of his Miranda rights was not involuntary.
In an effort to show, by a preponderance of the evidence, that he did not intelligently and understandingly waive his right to counsel, petitioner relies on the testimony offered both before and during trial by several "mental health" experts who had administered various intelligence and comprehension tests to petitioner. Dr. Lynn McLaughlin, Director of Psychological Services at Malcolm Bliss, administered a series of tests to petitioner during the Summer of 1987. Petitioner scored in the "average" range on the performance tests and on the "borderline mentally retarded" range on the verbal tests. *1311 Resp.Exh. A, Vol. IV, p. 1051. Dr. McLaughlin concluded that petitioner's performance skills were in the normal range, while his verbal skills were "impaired." Petitioner's verbal score on these tests equated to an IQ score of 74, and his performance on the comprehension tests equated to an IQ score of 80. Resp.Exh. A, Vol. IV, p. 1054. Dr. McLaughlin testified that petitioner's "full-scale IQ score was eighty-three" which is "in no stretch of imagination" borderline. Resp.Exh. A, Vol. IV, pp. 1066-67.
Also at the request of petitioner's trial counsel, Dr. Rosen, a clinical psychologist at Malcolm Bliss, conducted a neuropsychological evaluation of petitioner. Resp.Exh. A, Vol. IV, p. 1085. The purpose of the examination was to evaluate petitioner for substance abuse and to determine whether appellant suffered from any neuropsychological damage, in order to assess whether petitioner was capable of forming the specific intent required to commit first degree murder. Resp.Exh. A, Vol. IV, p. 1086. Dr. Rosen concluded that petitioner suffered from "impairment in the functioning of his brain" and that the impairment affected "his judgment, his decision making, his problem solving, and his impulse control." Resp.Exh. A, Vol. IV, p. 1103. Dr. Rosen based his conclusion on three tests which he conducted, as well as on the test results obtained by Dr. McLaughlin.
Petitioner adduced the testimony of Dr. Clara Matthews, an Assistant Professor of Communication Disorders at St. Louis University. Resp. Exh. A, Vol. IV, p. 1151. Dr. Matthews tested petitioner's language competency and reading and verbal skills to "determine whether or not he would have been capable of understanding the language in the [Miranda] waiver that he signed and the rights as they were presented to him on that waiver." Resp.Exh. A, Vol. IV, p. 1153. Dr. Matthews opined that if the Miranda warning was "broken down" into shorter sentences, "there is a possibility that [petitioner] could have understood that." Resp.Exh. A, Vol. IV, pp. 1169-70.
Finally, petitioner offered the testimony of Ms. Elizabeth Edelman, a psychological examiner for the Northwest School District in the City of St. Louis. Resp.Exh. A, Vol. IV, pp. 1174-75. Ms. Edelman was asked by petitioner's trial counsel to evaluate petitioner's reading and comprehension skills for the purpose of forming an opinion as to whether petitioner understood the significance of executing the waiver form. Resp.Exh. A, Vol. IV, p. 1175. Ms. Edelman administered another series of tests and determined that petitioner had an IQ of seventy-nine, which is not borderline mentally retarded. Rather, Ms. Edelman's tests indicated that petitioner was "borderline slow learner, low average type." Resp.Exh. A, Vol. IV, p. 1185.
In evaluating the testimony of these experts, the trial judge concluded that "[t]he expert testimony only indicates that according to the psychological and educational tests given, they would not expect [petitioner] to understand [the significance or his waiver of rights]. However, he definitely, himself, said that he did." Resp.Exh. A, Vol. I, p. 92. In reviewing this finding of the trial court, the Missouri Supreme Court found that:
After a review of the entire record, including listening to the tape, this Court concludes that the trial court's determination that defendant waived his rights knowingly and intelligently under the totality of the circumstances surrounding his confession is supported by substantial evidence and was not clearly erroneous. Consequently the admission of defendant's confession was not error.
State v. Powell, 798 S.W.2d at 713.
The Court is not persuaded by petitioner's reliance on the testimony described above of the various mental health experts. None of petitioner's witnesses on this issue attempted to ascertain whether petitioner actually did understand his Miranda rights. See, e.g., Resp.Exh. A, pp. 56-57, 78, 88, 1126, 1171, 1174, 1184-85. Further, two of the mental health experts, Dr. Matthews and Ms. Edelman, testified only that petitioner could not have understood his Miranda warnings if presented to him in writing on a "Warning and Waiver Form." However, when asked if petitioner might have understood his rights when they were orally explained to him, using different words and shorter sentences than those appearing on the written form, these two witnesses conceded that petitioner *1312 "probably would have understood" at least a portion of his rights.
The third expert, Dr. Rosen, who testified on petitioner's behalf with respect to this issue, opined that petitioner could not "fully appreciate ... the implications of ... waiving his [Miranda] rights." Resp.Exh. A, Vol. IV, p. 1109. See also Resp.Exh. A, Vol. I, pp. 50-52, & 57. However, the issue of understanding the ramifications of a waiver of rights differs significantly from the question of whether petitioner understood that he had a right to stand mute and await representation by counsel. Thus, this witness' testimony is not persuasive on the issue of whether petitioner knowingly elected to waive his right to remain silent. The Court finds that petitioner understood his right to remain silent and still elected make a statement. Whether he fully appreciated every consequence of that decision is not a relevant inquiry in the analysis of this ground. Cf. Colorado v. Spring, 479 U.S. at 574, 107 S.Ct. at 857-58.
Finally, in support of the its finding that petitioner made a knowing and voluntary waiver of his Miranda rights, the Court notes that an accused's prior experience with the criminal justice system may be relevant in determining whether a waiver of constitutional rights is valid. See Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 2571-72, 61 L.Ed.2d 197 (1979). Petitioner's arrest record reflects at least two arrests prior to his arrest on the murder charges underlying this habeas petition. See Resp.Exh. B, p. 44. In addition, the record suggests that petitioner also has a juvenile arrest record. See Resp. Exh. B, p. 353. Therefore, petitioner had prior experiences with the criminal justice system which may have aided him in understanding his rights in this case.
In the alternative, the State argues that any error resulting from the admission of the confession was harmless. In support of this assertion, the state relies on the nature and extent of other incriminating evidence. This evidence included the testimony of petitioner's step-brother, Calvin Courtney. Courtney's testimony places petitioner alone with the victims following the beating and robbery. Courtney also testified that he observed petitioner wipe blood from a knife which he was carrying and noticed blood splattered on petitioner's shoes.
The Court agrees with respondent that the evidence supporting a finding of guilt here is substantial. Testimony places petitioner at the murder scene, with the murder weapon. Following the robbery and murders, petitioner was seen covered with blood. Consequently, this Court finds that even absent petitioner's statement, there was clearly enough evidence to convict petitioner. The Court is not persuaded that petitioner's statement contributed to any significant degree to the jury's ultimate verdict of guilty on both murder counts. Cf. Chapman v. California, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). Therefore, the Court believes any error in admitting petitioner's statement was harmless. For these reasons, all relief based on Ground IV will be denied.

E. GROUND V: Unconstitutionality of Petitioner's Death Sentence
In Ground V, petitioner alleges that the Missouri death penalty statute violates the Eighth and Fourteenth Amendments to the United States Constitution because it permits death to be imposed in an arbitrary and capricious manner. Amended Petition, p. 42. Specifically, petitioner contends that "the Missouri death statute is patently unconstitutional because it fails to treat petitioner as a mentally retarded eighteen-year-old." Amended Petition, p. 43. Petitioner did not assert this claim in his motion for a new trial or his 29.15 motion, however, he did assert it on direct appeal from his conviction and sentence. Resp.Exh. E, p. 50.
The essence of petitioner's argument is that the Missouri death penalty statute is unconstitutional because it holds "mentally retarded" defendants to the same standards applicable to defendants not so impaired. Petitioner fails to cite any pertinent authority in support of this contention. Further, petitioner is quite simply incorrect. The Missouri statutory scheme specifically provides for consideration of the relevant attributes of each individual defendant, such as the defendant's mental condition. For example, *1313  552.015 R.S.Mo. provides in relevant part that:
2. Evidence that the defendant did or did not suffer from a mental disease or defect shall be admissible in a criminal proceeding:
(6) To determine whether or not the defendant, if found guilty, should be sentenced to death, as provided in chapter 558, RSMo;
* * * * * *
(8) To prove that the defendant did or did not have a state of mind which is an element of the offense.
Such consideration of individual attributes is mandated by the Supreme Court's decision in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).
In Lockett, Chief Justice Burger, writing for the plurality, stated the currently applicable rule:
[W]e conclude that the Eighth and Fourteenth Amendments require the sentencer ... not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.
Lockett, 438 U.S. at 604, 98 S.Ct. at 2964-65 (emphasis original). The Supreme Court held that the sentencer must be free to give "independent mitigating weight to aspects of defendant's character and record and to circumstances of the offence proffered in mitigation...." Id. at 605, 98 S.Ct. at 2965.
Pursuant to R.S.Mo.  552.015, evidence pertaining to petitioner's mental health was offered at trial, see, e.g., Resp.Exh. A, Vol. IV, pp. 1044, 1081, 1150, & 1174, and submitted to the jury for proper consideration during both the guilt and penalty phases of the trial. See, e.g., Resp.Exh. B, pp. 166, 169, 174, 177, & 183. Finally, the judge specifically noted for the record, prior to imposing sentence, that he had considered defendant's mental condition, youth and background. Resp.Exh. A(3), p. 15. Based on the record before the Court, petitioner cannot credibly argue that his character, personality, or mental condition were not considered by the trial court in imposing a sentence of death.
The Court finds that petitioner was in no way precluded from offering evidence concerning his alleged mental defect. The sentencing judge specifically acknowledged his consideration of that evidence in mitigation of sentencing. Accordingly, there is no evidence here that the imposition of a death sentence pursuant to the Missouri statutory scheme, either generally or as applied in this case, contravenes the Eighth or Fourteenth Amendments. Therefore, this ground is without merit, and all relief based on this ground will be denied.

F. GROUND VI: Trial Court Error in Instructing Jury As To Its Sentencing Responsibilities
In Ground VI, petitioner alleges that the trial judge erred in instructing the jury that if "it is unable to decide or agree upon the punishment, the court shall assess and declare the punishment...." Amended Petition, p. 45. Petitioner asserted this ground at trial, Resp.Exh. A, Vol. IV, p. 1243, in his motion for a new trial, Resp.Exh. B, p. 92, in his 29.15 motion, Resp.Exh. D, pp. 120-21, and on direct appeal. Resp.Exh. E, p. 77.
This admonition was conferred upon the jury in instruction number thirty-three, applicable to Count I and instruction number thirty-eight, applicable to Count II, which specifically provided that:
If after due deliberation, you are unable to agree upon the punishment, your foreman will sign the verdict form so stating. In such case, the Court will fix the defendant's punishment at death or at imprisonment for life by the Division of Corrections without eligibility for probation or parole. You will bear in mind, however, that under the law, it is the primary duty and responsibility of the jury to fix the punishment.
Resp.Exh. B, pp. 114 & 119. These two instructions are entirely consistent with R.S.Mo.  565.030.4 and MAI-CR3d 313.48. Further, as petitioner concedes, the constitutionality of MAI-CR3d 313.48 has been upheld on numerous occasions by the Missouri Supreme Court. See, State v. Six, 805 S.W.2d 159, 167 (Mo.1991); State v. Wacaser, *1314 794 S.W.2d 190, 194 (Mo.1990); State v. Griffin, 756 S.W.2d 475, 487-88 (Mo.1988).
Petitioner argues that since the Missouri Supreme Court first approved the language of MAI-CR3d 313.48 in State v. Sandles, 740 S.W.2d 169 (Mo.1987), there have been several instances in which a jury has been "unwilling or unable to agree on punishment." Amended Petition, p. 45. Petitioner argues that those cases in which a jury has failed to agree on punishment "illustrate the offending language in the last paragraph of Instruction No. 33 [and Instruction No. 38] violates the United States Constitution in that it leads the jury to believe that the responsibility for sentencing rests other than in its own hands." Amended Petition, p. 45. In support of this contention, petitioner cites Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) and Adams v. Wainwright, 804 F.2d 1526 (11th Cir.1986).[4]
In Caldwell, the Supreme Court held that by telling the sentencing jury that the state supreme court would automatically review defendant's death sentence, the prosecutor minimized the jury's sense of the importance of its role, in violation of the Eighth Amendment. Caldwell, 472 U.S. at 328-29, 105 S.Ct. at 2639-40. The Supreme Court found that the thrust of the prosecutor's comments suggested that the jury could "pass its decision off to the state supreme court by sentencing the defendant to death." Id. This in turn created bias and prejudice in favor of imposing the death penalty and thus required that defendant's death sentence be vacated. Id. at 331-33, 105 S.Ct. at 2640-42.
In contrast, in California v. Ramos, 463 U.S. 992, 1009, 103 S.Ct. 3446, 3457-58, 77 L.Ed.2d 1171 (1983), the jury was instructed that they could sentence defendant to death or to life imprisonment. However, the judge explained that the state governor has the power to grant a reprieve, pardon, or commutation of a sentence following conviction of a crime. Ramos, 463 U.S. at 995-96, 103 S.Ct. at 3450-51. The Supreme Court rejected the defendant's argument that such an instruction deflects the jury's attention away from its central task. Id. at 1005-1006, 103 S.Ct. at 3455-56.
Similar to Ramos, instruction numbers thirty-three and thirty-eight are both correct statements of the law, and reflect the sentencing mechanism imposed if the jury should fail to reach a verdict on sentencing. Further, in this case, the instructions explicitly provide that "You[, the jury,] will bear in mind, however, that under the law, it's the primary duty and responsibility of the jury to fix the punishment." Resp.Exh. B, p. 114. Instruction numbers thirty-three and thirty-eight are simply not misleading or inaccurate. The Court finds no evidence that the challenged instructions generated a bias in favor of returning a death sentence or that the instructions dissuaded the jury from giving full consideration to the "constitutionally relevant evidence." Cf. Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 1197, 108 L.Ed.2d 316 (1989). Therefore, the Court finds this ground to be without merit, and no relief will be afforded petitioner on Ground VI.

G. GROUND VII: Trial Court Error in Denying Motion for Recusal
In his seventh ground for relief, petitioner alleges that "the trial court erred in overruling petitioner's motion for the court's recusal after the court had demonstrated its predisposition of imposing the death penalty in that the trial court was barred from imposing the sentence of death because the jury returned deadlocked in the sentencing phase, and (by returning deadlocked) sentenced petitioner to life; thus the trial court violated the double jeopardy clause of the United States Constitution." Amended Petition, p. 46. The Court construes this ground as asserting two claims. In Claim One under Ground VII, petitioner alleges that the judge should have recused himself from the sentencing proceedings because he was biased in favor of conferring the death penalty. In Claim Two, petitioner alleges that because the jury was deadlocked, the trial judge's imposition of sentence violated the double jeopardy clause. Petitioner asserted Claim One at trial, Resp. Exh. A(3), pp. 3-4, in his motion for a new trial, Resp.Exh. B, pp. 92-93, in his 29.15 motion, Resp.Exh. D, pp. 124-25, and on *1315 direct appeal. Resp.Exh. E, pp. 91-94. Petitioner asserted Claim Two only on direct appeal. Resp.Exh. E, p. 94.
Generally, a habeas petitioner challenging his conviction or sentence on due process grounds, based on the trial judge's alleged bias, must demonstrate that the judge was actually biased or prejudiced against the petitioner. See Dyas v. Lockhart, 705 F.2d 993, 996-97 (8th Cir.), cert. denied, 464 U.S. 982, 104 S.Ct. 424, 78 L.Ed.2d 359 (1983); Corbett v. Bordenkircher, 615 F.2d 722, 723-24 (6th Cir.1980); Brinlee v. Crisp, 608 F.2d 839, 852-53 (10th Cir.1979); compare Smith v. Phillips, 455 U.S. 209, 215-220, 102 S.Ct. 940, 944-48, 71 L.Ed.2d 78 (1982) (petitioner alleging juror bias must prove actual bias to establish due process claim). As the Supreme Court has recognized, "[n]ot only is a biased decision-maker constitutionally unacceptable but `our system of law has always endeavored to prevent even the probability of unfairness.'" Withrow v. Larkin, 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975), quoting In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955).
The Court recognizes that in some circumstances, "the probability of actual prejudice on the part of the judge or decisionmaker [may be] too high to be constitutionally tolerable." Withrow, 421 U.S. at 47, 95 S.Ct. at 1464. For example, caselaw supports the generalization that the probability of actual bias is too high where the judge has a pecuniary interest in the outcome of a trial. See, e.g., Ward v. Monroeville, 409 U.S. 57, 61-62, 93 S.Ct. 80, 83-84, 34 L.Ed.2d 267 (1972); Tumey v. Ohio, 273 U.S. 510, 511, 47 S.Ct. 437, 438, 71 L.Ed. 749 (1927). Similarly, where a party has had some type of dispute or conflict with the presiding judge, the probability of actual bias may be too high. See, e.g., Taylor v. Hayes, 418 U.S. 488, 501-03, 94 S.Ct. 2697, 2704-06, 41 L.Ed.2d 897 (1974); Mayberry v. Pennsylvania, 400 U.S. 455, 464-66, 91 S.Ct. 499, 504-05, 27 L.Ed.2d 532 (1971). See also Withrow, 421 U.S. at 47, 95 S.Ct. at 1464-65. The test in determining the propriety of a presumption of judicial bias is whether, "realistically considering psychological tendencies and human weaknesses, the judge would be unable to hold the proper balance between the state and the accused." Dyas v. Lockhart, 705 F.2d at 996-97, citing, Tumey v. Ohio, 273 U.S. 510, 532, 47 S.Ct. 437, 444; Withrow v. Larkin, 421 U.S. at 47, 95 S.Ct. at 1464-65; Taylor v. Hayes, 418 U.S. 488, 501, 94 S.Ct. 2697, 2704-05, 41 L.Ed.2d 897 (1974). In considering a claim of bias directed against a trial judge, the Court presumes the honesty and integrity of those serving as judges. Withrow, 421 U.S. at 47, 95 S.Ct. at 1464-65.
In support of Claim One, that the trial judge was biased, petitioner alleges that "through the medium of extrajudicial contacts," the trial judge expressed his predisposition to impose the death penalty. Specifically, petitioner alleges that the trial judge "had a connection or relationship with the family of one William Gephardt who is serving a sentence of life without probation or parole. Their opinions indicate a sentence of death may be more humane for the defendant's family than a life term." Amended Petition, p. 47.
Initially, the Court notes that it is unclear whose "opinions" petitioner is referring to, or that the opinions reflect the views of the trial judge. However, the trial judge acknowledged that he knew the Gephardt family, that the Gephardts lived in his neighborhood, and they attended the same church. The judge also indicated that one of the his sons attended grade school with William Gephardt. Resp.Exh. A(3), p. 5. Nevertheless, the judge indicated that he never socialized with the Gephardts and very little contact with them. Resp.Exh. A(3), p. 5. Finally, the judge expressly indicated that his acquaintance with the Gephardt family in no way affected his judgment in petitioner's case. Resp.Exh. A(3), p. 5.
Petitioner does not challenge the judge's response to petitioner's allegation of prejudice. Consequently, this Court finds that petitioner has failed to demonstrate that the trial judge was "actually biased or prejudiced against the petitioner" as a consequence of the judge's acquaintance with the Gephardt family. Cf. Dyas, 705 F.2d at 996-97. Consequently, petitioner will be denied all relief based on this argument under Claim One.
*1316 As additional evidence of the judge's alleged bias, petitioner claims that in a conversation with Reverend Paul Beins, the trial judge stated that "because of [his] concerns for [his] retarded son that [he] would rather have [his] son executed rather than spend the rest of his life in prison." Resp.Exh. C, p. 290. In response to this allegation of bias, the trial judge testified before the court conducting hearings on petitioner's 29.15 motion (the "29.15 Court") that prior to meeting with Reverend Beins, he had already made his decision to sentence petitioner to death and had so advised counsel. See Resp.Exh. C, p. 290. Petitioner does not challenge this assertion. See, e.g., Resp.Exh. A(3), pp. 5-6.
Further, contrary to the testimony of Reverend Beins, the trial judge testified that he made no representations to Reverend Beins about the judge's own personal feelings concerning the death penalty. Id. The 29.15 Court found the trial judge's recollection of the conversation between the himself and Reverend Beins more credible. In light of the evidentiary hearing and the specific, written factual findings on this point, the Court is compelled to accept the factual findings of the 29.15 Court on this issue. See, e.g., Sumner v. Mata, 449 U.S. at 547, 101 S.Ct. at 769. Based on the record, this Court concludes that the trial judge's comments to those people unrelated to the case, standing alone, are insufficient to raise the conclusive presumption of his actual bias. Consequently, petitioner will be denied all relief based on this argument under Claim One.
Finally petitioner alleges that the judge "discussed the case with at least one juror and had access to a note detailing the progress of the jury's deliberations." Amended Petition, p. 47. The record indicates that at least one juror did express to the trial judge that "he[, the juror,] thought that being in the penitentiary was worse than being executed." Resp.Exh. A(3), p. 6. However, there is no indication that the juror's statement impacted the judge's ultimate decision to impose the death penalty. In fact, the judge advised counsel that the juror's statement had "absolutely no affect on my decision." Resp.Exh. A(3), p. 7.
With regard to the note which allegedly detailed the progress of the jury's sentencing deliberations, the trial judge indicated that he was not even aware that the file contained a note. Resp.Exh. A(3), p. 6. Petitioner does not challenge this assertion, nor has he provided the Court with a copy of this note. Again, the record lacks any evidence that the trial judge was "actually biased or prejudiced against the petitioner." Cf. Dyas, 705 F.2d at 996-97. Thus all relief based on this aspect of Claim One under Ground VII will be denied.
In an effort to support Claim One, that the trial judge should have recused himself, petitioner cites Missouri Supreme Court, Rule 2, Canon 3 of the Code of Judicial Conduct. The version of Canon 3 upon which petitioner relies,[5] provides in relevant part:
C. Disqualification.
(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:
(a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
First, as indicated above, the Court finds no support in the record for petitioner's contention that the trial judge had a personal bias or prejudice against petitioner. Further, even if this Court were to find that the Code of Judicial Conduct compelled the trial judge's disqualification, which this Court does not, such a conclusion would not necessarily imply impermissible bias under the due process clause. Cf. Dyas, 705 F.2d at 996-97, citing Note, Disqualification of Judges and Justices in the Federal Courts, 86 Harv.L.Rev. 736, 746 (1973). The record simply fails to support a finding that the trial judge possessed any interest in the outcome of the trial, such that he was unable to hold the proper balance between the state and the accused. In re Murchison, 349 U.S. at 136, *1317 75 S.Ct. at 625. Consequently, the Court rejects this argument.
In Claim Two under Ground VII, petitioner alleges that he was subjected to double jeopardy when the trial judge imposed the death sentence after the jury was unable to agree on punishment. In support of this contention, petitioner cites Bullington v. Missouri, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981). In Bullington, the petitioner had been convicted of capital murder and sentenced by a jury to life imprisonment. Petitioner filed a motion for a new trial, based on the composition of the jury, which the trial court granted. At the retrial, petitioner was again convicted, but this time, the jury sentenced him to death. The United States Supreme Court concluded that the first jury implicitly found insufficient evidence to justify the imposition of a death sentence. Therefore, consistent with Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978),[6] the second jury was foreclosed from considering that punishment.
The facts of Bullington are distinguishable from the facts of this case, and consequently, petitioner's reliance on that case is not persuasive. Here, in contrast to Bullington, the jury never reached a verdict with regard to sentencing. Consequently, pursuant to R.S.Mo.  565.030, the burden fell upon the trial judge to impose sentence. Because the jury never reached a verdict on sentencing, there was simply no verdict to which jeopardy attached.
Aside from Bullington, which the Court distinguishes above, petitioner fails to offer any authority in support of this claim. Further, petitioner has no constitutional right to be sentenced by a jury. See Spaziano v. Florida, 468 U.S. 447, 460, 104 S.Ct. 3154, 3162, 82 L.Ed.2d 340 (1984). Finally, petitioner cannot demonstrate that the jury ever reached a verdict to which jeopardy might attach, consequently, there is no basis for claiming double jeopardy. Both Claims One and Two are without merit, and all relief on Ground VII will be denied.

H. GROUND VIII: Missouri Supreme Court Error In Conducting Proportionality Review
As Ground VIII of his amended petition, petitioner alleges that the Missouri Supreme Court erred in finding that petitioner's sentence of death was not excessive or disproportionate to the penalty imposed in similar cases. Amended Petition, pp. 47-48. The thrust of petitioner's argument is that the Missouri Supreme Court's proportionality review mechanism is unconstitutional because it is not governed by specific standards. Amended Petition, p. 48. The Court's review of the record fails to indicate that this ground was ever presented to any Missouri court. See generally, Resp.Exh. B, Resp.Exh. D, Resp.Exh. E.
In Wainwright v. Sykes, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506-07, 53 L.Ed.2d 594 (1977), the United States Supreme Court held that a federal court should not reach the merits of a petitioner's habeas corpus claim if he has failed adequately to present it to a state court. In order for a claim to have been adequately presented to a state court for procedural purposes in a habeas proceeding, the same facts and legal theories in support of the claim must be advanced in both state and federal court. Gilmore v. Armontrout, 861 F.2d 1061, 1065 n. 8 (8th Cir.1988), cert. denied, 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989) (citing Picard v. Connor, 404 U.S. 270, 277, 92 S.Ct. 509, 513, 30 L.Ed.2d 438 (1971)). Because petitioner's argument was not presented in the state courts, such a contention is now procedurally barred unless petitioner shows cause and prejudice. He has shown neither. Further, the record does not support a finding of petitioner's probable innocence. Accordingly, this Court will deny petitioner any relief on this ground.
Further, even if the Court were to reach the merits of this ground, petitioner's attack on the Missouri Supreme Court's proportionality mechanism is foreclosed by the Eighth Circuit's decisions in Foster v. Delo, 39 F.3d 873, 882 (8th Cir.1994) and Murray v. Delo, *1318 34 F.3d 1367, 1376-77 (8th Cir.1994). In both cases, the Eighth Circuit noted that the federal constitution provides for no such proportionality review. However, by statute, the State of Missouri has conferred such a right. See R.S.Mo.  565.035. See also, Pulley v. Harris, 465 U.S. 37, 48-51, 104 S.Ct. 871, 878-80, 79 L.Ed.2d 29 (1984). Under that statute the Missouri Supreme Court undertakes a comparative review of all verdicts in which a jury or a judge imposed capital punishment instead of imprisonment for life. In that context, this Court's role is to ensure that the right created by state law is not arbitrarily denied. Wolff v. McDonnell, 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974).
In this case, the both parties had notice that the proportionality of petitioner's sentence would be reviewed on direct appeal, see R.S.Mo.  565.035, and both parties were free to argue the issue. Petitioner did in fact argue the issue of proportionality in his brief, submitted on appeal to the Missouri Supreme Court. See Resp.Exh. E, pp. 95-96. The Missouri Supreme Court then performed the proportionality review compelled by R.S.Mo.  565.030 and found "no evidence that the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor." Powell, 798 S.W.2d at 716. "The Constitution does not require us to look behind that conclusion." Walton v. Arizona, 497 U.S. 639, 656, 110 S.Ct. 3047, 3058, 111 L.Ed.2d 511 (1990). Consequently, Ground VIII is without merit, and all relief based on that ground will be denied.

I. GROUND IX: Trial Court Error In Sentencing Petitioner ÔÇö Deprivation of Right to Jury Trial
In Ground IX, petitioner alleges that "the Trial Court committed constitutionally reversible error in sentencing [petitioner] to death because the General Assembly in enacting the capital punishment statute vested exclusive jurisdiction in the jury as sentencer." Amended Petition, p. 50. Initially, the Court notes that, similar to Ground VIII, it does not appear that petitioner has raised this precise ground before the Missouri courts. Consequently, absent a showing of cause and prejudice or of a miscarriage of justice, this Court need not consider petitioner's ground. Wainwright v. Sykes, 433 U.S. at 87, 97 S.Ct. at 2506-07. Petitioner fails to make any such showing. Thus this Court will deny petitioner all relief based on Ground IX. Cf. Rose v. Lundy, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).
In addition, even if the Court were to reach the merits of this ground, petitioner still fails to demonstrate his entitlement to habeas relief. Petitioner does not and cannot direct the Court to a single authority in support of his proposition that "Trial Courts lack constitutional authority to sentence a person to death where the jury cannot agree on punishment." The one case cited in support of this contention, State v. Sandles, 740 S.W.2d 169 (Mo.1987), actually supports the opposite conclusion, in that the Missouri Supreme Court affirmed the trial judge's imposition of a death sentence when the jury was unable to agree on punishment.
Contrary to petitioner's position, there is no constitutional right to be sentenced by a jury. See Spaziano v. Florida, 468 U.S. 447, 460, 104 S.Ct. 3154, 3162, 82 L.Ed.2d 340 (1984). In Spaziano, the jury initially recommended a life sentence. In accordance with Florida law, the judge then reexamined the aggravating and mitigating circumstances and imposed a death sentence. The United States Supreme Court affirmed the trial judge's imposition of a death sentence, noting that the Sixth Amendment does not require that a jury impose sentence. Id. at 464, 104 S.Ct. at 3164. Further, to resolve any doubts concerning a convicted person's right to the imposition of sentence by a jury, in Hildwin v. Florida, the United States Supreme Court affirmed the imposition of a death sentence by the trial judge, stating that, "the existence of an aggravating factor here is not an element of the offense but instead is `a sentencing factor that comes into play only after the defendant has been found guilty.'" Hildwin v. Florida, 490 U.S. 638, 640, 109 S.Ct. 2055, 2057, 104 L.Ed.2d 728 (1989), quoting McMillan v. Pennsylvania, 477 U.S. 79, 86, 106 S.Ct. 2411, 2416, 91 L.Ed.2d 67 (1986).
In this case, any right petitioner may have to be sentenced by a jury is provided for by *1319 Missouri law, specifically R.S.Mo.  565.030. There is no indication that petitioner was in anyway deprived of those rights afforded him under Missouri law. Consequently, there is no constitutional deprivation here. Cf. Murray, 34 F.3d at 1377.
In support of this ground, petitioner also reasserts his double jeopardy argument, which was first asserted in Ground VII. In this version of that argument, petitioner cites Article I,  19 of the Missouri Constitution pertaining to self-incrimination and double jeopardy. Again, petitioner's argument is flawed to the extent that he is unable to demonstrate that the jury ever reached a verdict to which jeopardy might attach. In addition, petitioner simply cannot demonstrate any constitutional right to be sentenced by a jury. Thus the Court again rejects petitioner's double jeopardy argument. For the above stated reasons, all relief based on this ground will be denied.

J. GROUND X: Due Process Deprivation As A Consequence Of Court Sentencing Petitioner
Petitioner asserts Ground X as an alternative basis for relief to Ground IX. In Ground X, petitioner alleges that the trial court erred in imposing sentence pursuant to R.S.Mo.  565.030.4 because that provision of Missouri law, which permits the trial judge to impose sentence when the jury cannot agree on punishment, deprives petitioner of his due process rights. This claim was asserted in petitioner's motion for a new trial, Resp.Exh. B, p. 91-93, his 29.15 motion, Resp.Exh. D, p. 126, and on direct appeal. Resp.Exh. E, 93.
In this ground, petitioner asserts that Missouri law fails to provide adequate procedures for a trial judge to follow in sentencing a convicted person once the jury indicates its inability to reach a unanimous verdict on sentencing. This argument is also without merit. Contrary to petitioner's assertion, R.S.Mo.  565.030.4 explicitly provides that "[t]he court shall follow the same procedure as set out in this section whenever it is required to determine punishment for murder in the first degree." Further, R.S.Mo.  565.032, which is cross-referenced in  565.030.4, sets forth the procedures to be followed by either the jury or the judge in considering evidence in assessing punishment. Finally, the existence of mitigating and/or aggravating circumstances does not constitute an element of the offense but instead merely constitutes sentencing factors which become relevant only after the guilt of the accused has been ascertained. See, e.g., Hildwin, 490 U.S. at 640, 109 S.Ct. at 2056-57. Permitting the trial judge to make specific findings regarding such circumstances does not contravene petitioner's constitutional rights. See, e.g., McMillan, 477 U.S. at 86, 106 S.Ct. at 2416.
Petitioner is clearly entitled to have the "trier," as that term is used in R.S.Mo.  565.030, consider all relevant evidence in mitigation of sentencing. See, e.g., Eddings v. Oklahoma, 455 U.S. 104, 114, 102 S.Ct. 869, 876-77, 71 L.Ed.2d 1 (1982). The record clearly indicates that petitioner was afforded the opportunity to present such evidence, see Resp.Exh. A, Vol. IV, pp. 1291-1331, and the trial court expressly indicated its consideration of that mitigation evidence, as well a consideration of a "social history" of petitioner, prepared at petitioner's request, when it imposed sentence. See Resp.Exh. A(3), pp. 14-16. Petitioner fails to demonstrate how his constitutional rights were violated through the judge's imposition of sentence. Consequently, all relief based on Ground X will be denied.

K. GROUND XI: Trial Court Error In Failing To Quash Indictment
In Ground XI, petitioner alleges that the trial court denied him "a fair and impartial trial by jury in refusing to quash [petitioner's] indictment because the petit jury was not representational and was not composed of a fair-cross-section of the community with respect to race." Amended Petition, p. 55. Petitioner asserted this ground in the Missouri courts without success. See Resp.Exh. B, p. 65; Resp.Exh. E, pp. 111-112.
The Court construes this ground as asserting two distinct claims. First, petitioner alleges that the jury venire panel and petit jury were not comprised of his peers. In support of this allegation, petitioner argues that:

*1320 In this case, petitioner is a member of the African-American race and he was a resident of the City of St. Louis, where the population is 40 to 50 percent African American. Despite the fact that 40 to 50 percent of the population of St. Louis is African American, only 25 percent of the jury venire panel was of that race. This disproportion was further exacerbated by the fact that the prosecuting attorney struck 50 percent of all remaining potential African American jurors.
Amended Petition, p. 56.
To the extent petitioner challenges the composition of the venire panel, his claim is without merit. In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury-selection process. Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 668-69, 58 L.Ed.2d 579 (1978). The record contains absolutely no evidence to support a finding of any of these requirements. The absence of such evidence is "fatal to [petitioner's] claim based upon this ground." Haley v. Armontrout, 924 F.2d 735, 739 (8th Cir.1991).
Petitioner's attack based on the composition of the petit jury is equally without merit. The fair-cross-section requirement simply does not extend to a petit jury. Lockhart v. McCree, 476 U.S. 162, 173-74, 106 S.Ct. 1758, 1764-65, 90 L.Ed.2d 137 (1986); United States v. Townsley, 856 F.2d 1189, 1191 (8th Cir.1988). "The limited scope of the fair-cross-section requirement is a direct and inevitable consequence of the practical impossibility of providing each criminal defendant with a truly `representative' petit jury ... a basic truth that the Court of Appeals itself acknowledged for many years prior to its decision in [Grigsby v. Mabry, 758 F.2d 226 (8th Cir.1985)]." Lockhart, 476 U.S. at 173-74, 106 S.Ct. at 1765, citing United States v. Childress, 715 F.2d 1313 (8th Cir.1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984); Pope v. United States, 372 F.2d 710, 725 (8th Cir. 1967), vacated on other grounds, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968). Petitioner's fair-cross-section claims are without merit and thus all relief on that basis will be denied.
In his second claim under this ground, petitioner asserts a Batson challenge. In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court confirmed that a state prosecutor violates the equal protection clause of the Fourteenth Amendment if he or she utilizes peremptory challenges to strike venire members from the jury on the basis of race. Id. at 86, 106 S.Ct. at 1717. In Batson, the Supreme Court explained that to establish a prima facie case of discrimination:
the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude venire-men from the petit jury on account of their race.
Id. at 96, 106 S.Ct. at 1723 (citations omitted). "After a defendant establishes a prima facie case, the burden then shifts to the government to `articulate a neutral explanation related to the particular case to be tried.' `The prosecutor must give a "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges.'" United States v. Wilson, 884 F.2d 1121, 1124 (8th Cir.1989), quoting Batson, 476 U.S. at 98 & n. 20, 106 S.Ct. at 1723-24 & n. 20.
At trial, petitioner challenged the state's peremptory strikes with regard to two jurors: *1321 Juror Number 906, Thomas Robinson, an African-American male, and Juror Number 767, Geraldine Waller, an African-American female. Petitioner also challenged the state's use of its alternate strike to remove Juror Number 652, Ronald Gragg, an African-American male. The trial judge concluded that the state's use of two of its nine peremptory strikes to remove these prospective jurors did not give rise to a Batson problem, in part because two African-Americans remained on the jury. Nevertheless, the court presumed the existence of a prima facie case and asked the state to articulate its reasons for the strikes.
In response, the state alleged that it struck all three jurors because the prosecutor did not believe any of the three jurors would be able to consider the death penalty in this particular case. Resp.Exh. A, Vol. II, pp. 803, 804 & 805. This belief is supported by the voir dire testimony of all three prospective jurors. Mr. Gragg, Juror Number 652, indicated during voir dire that his willingness to impose a death sentence might depend on the circumstances of a given case. Resp. Exh. A, Vol. II, p. 471. Similarly, when Ms. Waller was asked, during voir dire examination, whether she believed in the death penalty, she responded in the negative. Resp. Exh. A, Vol. I, p. 168. Finally, Juror Number 906, Mr. Robinson, during voir dire, also expressly stated "I don't believe in the death penalty." Resp.Exh. A, Vol. I, p. 165. Based on these statements, the Court finds a sufficient, non-racial reason for striking all three jurors.
This Court's conclusion that respondent's decision to strike those jurors was not racially motivated is consistent with the finding of the 29.15 Court. In response to petitioner's 29.15 motion, the 29.15 Court concluded that "a review of the trial transcript indicates that each of these jurors indicated trouble with the death penalty, and therefore, for reasons as previously enumerated, in Lockhart and other cases, that the Court was correct in its decision [to deny petitioner's motion to strike the jury panel]." Resp.Exh. D, p. 25. Similarly, the Missouri Supreme Court, in affirming petitioner's conviction, "examined each and every point and subpoint asserted by the [petitioner] and finds no reversible error and concludes [that petitioner] received a fair trial." 798 S.W.2d at 716.
In light of the 29.15 Court's and the Missouri Supreme Court's explicit factual findings on this issue and the notable absence of any attempt by petitioner to demonstrate that respondent's proffered reasons for striking the jurors in question were merely pretext, this Court will defer to the Missouri courts' conclusion that petitioner's Batson challenge is without merit. See Jones v. Jones, 938 F.2d 838, 843 (8th Cir.1991) (upholding district court's deferral to state trial court's resolution of Batson issue). Here, as in Jones, the record clearly supports the conclusion that the prosecutor's explanations were race-neutral and not frivolous. Id. Based on the foregoing, this Court concludes that all claims asserted in Ground XI of petitioner's amended petition are without merit and thus no relief will be afforded petitioner on that basis.

L. GROUND XII: Trial Court Error Denying Petitioner a Fair Trial
Petitioner's final ground for relief contains seven claims relating to errors allegedly occurring during the voir dire portion of the trial. The voir dire and jury selection process proceeded in the following manner. The trial court requested a venire panel of seventy-five prospective jurors. From that venire panel, the judge sought twelve jurors and two alternates. The judge granted each party nine strikes in the selection of the jury. The judge also granted each party the opportunity to strike one of four potential alternate jurors. Consequently, the judge determined that thirty-four veniremen needed to be "death-qualified." The process of death-qualification requires an examination of prospective jurors as to whether they could, "under the appropriate circumstances[,] consider the full range of punishment, which in this case includes the death penalty." Resp. Exh. A, Vol. I, p. 96.
In addition to the death-qualification questions, the court examined prospective jurors on the issue hardships resulting either from the anticipated length of the trial or from being sequestered. For purposes of this initial inquiry, the judge, in consultation with *1322 the parties, agreed to divide the venire panel into three groups of twenty-five. The first group was examined in the morning, the next group that afternoon, and the third group the following morning. Each group of twenty-five was divided approximately in half for purposes of this initial inquiry. Consequently, the jury was death-qualified in groups of approximately twelve.
In Claim One under Ground XII, petitioner alleges that the trial court "denied petitioner a fair trial by overruling petitioner's motion for individual voir dire and [sic] in the alternative individual sequestered voir dire." Amended Petition, p. 58. Specifically, petitioner contends that by denying his motion to individually voir dire prospective jurors, the Court deprived petitioner of an opportunity to ascertain which prospective jurors, if any, might be prone to impose the death penalty. Petitioner asserted this claim in his motion for a new trial, Resp.Exh. B, p. 62, in his 29.15 motion, Resp.Exh. D, p. 93, and on direct appeal. Resp.Exh. E, p. 99.
Petitioner acknowledges that, under Missouri law, individual voir dire is not required. Amended Petition, p. 59. However, petitioner argues that "such sequestered voir dire is essential, and constitutionally required for a fair trial, given the undisputed fact that sociological research in jury studies has shown that jurors intend [sic] to be more open and forthright in answering voir dire questions when they are questioned in the privacy of the judge's chambers." Amended Petition, p. 59.
In reviewing the voir dire examination conducted in cases tried before a state court, this Court's authority is limited to enforcing the commands of the United States Constitution. See Mu'Min v. Virginia, 500 U.S. 415, 422, 111 S.Ct. 1899, 1903, 114 L.Ed.2d 493 (1991). In Connors v. United States, 158 U.S. 408, 15 S.Ct. 951, 39 L.Ed. 1033 (1895) the Supreme Court stated that:
[A] suitable inquiry is permissible in order to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried. That inquiry is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion. This is the rule in civil cases, and the same rule must be applied in criminal cases.
Connors, 158 U.S. at 413, 15 S.Ct. at 953, quoted in Mu'Min, 500 U.S. at 422, 111 S.Ct. at 1903-04. The state trial court possesses great latitude in deciding what questions should be asked in voir dire, and how that voir dire should be conducted. Rosales-Lopez v. United States, 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981).
Petitioner cites only one case, Hovey v. Superior Court, 28 Cal.3d 1, 168 Cal.Rptr. 128, 616 P.2d 1301 (1980), in support of his contention that each juror should be individually examined. In Hovey, the California Supreme Court held that, in capital cases, that portion of the voir dire of each prospective juror pertaining to issues involving their ability to impose the death penalty should be done individually and in sequestration. The rationale behind this result is, in part, to prevent the "prejudicial alterations" in jurors' attitudes concerning the death penalty, by not permitting perspective jurors to observe the death-qualification of his or her fellow venire-person. Id. 168 Cal.Rptr. at 177-78, 616 P.2d at 1350. Additionally, a reduction in the pretrial emphasis on the penalty phase of the trial may minimize the tendency of a death-qualified jury to presume guilt. Id. at 180-81, 616 P.2d at 1353.
This Court finds Hovey unpersuasive. First, in this case, the court examined the prospective jury members in groups of approximately twelve, effectively reducing the potential for "prejudicial alterations" in jurors' attitudes. Second, each juror was instructed that "if they have an hesitation or any concern about making an answer in front of the panel, they may approach the bench and make a response there," thus further reducing the impact of the presence of other prospective jurors. Resp.Exh. A, Vol. I, p. 116, citing MAI-CR3d  300.02.
In addition, in Hovey, the California Supreme Court did not cite a single principle of the federal constitution which compelled the adoption of such a rule requiring individual, sequestered voir dire. Finally, this "rule" was established by the California Supreme *1323 Court pursuant to its "supervisory authority" over the court's of that state. It is not binding upon either this Court or the Missouri courts, and petitioner cannot cite a single court in this circuit which has adopted the holding or rationale of Hovey. For these reasons, this Court will reject Claim One of petitioner's amended petition.
In his second claim under Ground XII, petitioner alleges that his right to a fair trial was impeded when the trial court denied his request to waive sequestration. Petitioner asserted this claim in his motion for a new trial, Resp.Exh. B, p. 60, in his 29.15 motion, Resp.Exh. D, p. 92, and on direct appeal. Resp.Exh. E, p. 100. In response to this claim, the state cites R.S.Mo.  546.230, which requires the trial court to sequester juries in capital cases.
Petitioner argues that by sequestering the jury the judge precluded "poor to moderate income persons, and persons in charge of young children on a daily basis," from serving on the jury. In support of this proposition, petitioner cites Hovey, which the Court rejected above. The Court's reading of Hovey fails to support petitioner's assertion. The sequestration referred to in Hovey is sequestration of each individual juror while being death-qualified. In contrast, this claim relates to petitioner's motion to waive sequestration of the jury during the entire trial. The rationale behind sequestration in Hovey, namely to protect individual jurors from influences by other jurors' views on the death penalty, is quite different from the need to sequester jurors during the entire trial, in order to protect them from improper societal influence and to insure that the jury is kept together. Hovey simply does not address the propriety or necessity of maintaining the jury together during the course of the trial.
Aside from this reference to Hovey, petitioner offers no support for this claim. Consequently, the Court finds this claim under Ground XII to be unsupported and without merit. Therefore, all relief based on this claim will be denied.
In his next claim under Ground XII, petitioner alleges that his constitutional rights were violated when the trial court permitted the state to peremptorily strike "death scruple [sic] jurors prone to giving life sentences, but who have exhibited an open mind toward the death penalty." Amended Petition, p. 60. Petitioner asserted this claim in his motion for a new trial, Resp.Exh. B, p. 70, in his 29.15 motion, Resp.Exh. D, p. 101, and on direct appeal. Resp.Exh. E, p. 100.
Courts generally do not review the prosecution's reasons for exercising preemptory challenges, unless the petitioner can establish a prima facie case of purposeful discrimination. Gray v. Mississippi, 481 U.S. 648, 667, 107 S.Ct. 2045, 2056, 95 L.Ed.2d 622 (1986); Cf. Batson v. Kentucky, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986). "[A] prosecutor ordinarily is entitled to exercise permitted peremptory challenges `for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried." Batson, 476 U.S. at 89, 106 S.Ct. at 1719, citing United States v. Robinson, 421 F.Supp. 467, 473 (D.Conn.1976), mandamus granted sub nom. United States v. Newman, 549 F.2d 240 (2nd Cir.1977). Equal Protection Clause limitation impose the only restraint on the prosecution's effort to exercise peremptory challenges. Batson, 476 U.S. at 89, 106 S.Ct. at 1719.
In support of this claim, petitioner cites Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) and Gray v. Mississippi, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1986). In Witherspoon, the Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Witherspoon, 391 U.S. at 521-22, 88 S.Ct. at 1777 (emphasis added). The Court reached a similar conclusion in Gray. Because both of these cases pertain to strikes for cause, rather than the exercise of peremptory strikes, the Court finds them unpersuasive on this issue.
Further, Gray is directly contrary to petitioner's asserted position. Although not at issue in Gray, a majority of the court made it *1324 clear that they would not adhere to an extension of Witherspoon to cases involving peremptory challenges. Justice Powell, concurring in part and concurring in the judgment, stated, "[t]here can be no dispute that a prosecutor has the right, indeed the duty, to use all legal and ethical means to obtain a conviction, including the right to remove peremptorily jurors whom he believes may not be willing to impose lawful punishment." Gray, 481 U.S. at 671, 107 S.Ct. at 2058 (Powell, J., concurring).
In the alternative, to the extent that petitioner alleges that certain jurors were stricken for cause based on their expressed views about the death penalty, in violation of the constitution, his claim is equally without merit. In Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Supreme Court reaffirmed its holding that the Constitution does not prohibit the removal for cause of a prospective juror whose opposition to the death penalty is so strong that it would substantially impair the performance of their duties at the sentencing phase of the trial. Lockhart, 476 U.S. at 184, 106 S.Ct. at 1770-71; Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980); see also, Witherspoon, 391 U.S. at 522 & n. 21, 88 S.Ct. at 1777 & n. 21.
Twenty-two jurors were struck for cause during the death-qualifying portion of the voir dire. Of those twenty-two, ten were struck by the prosecution based on the prospective jurors' representations that they could not impose the death penalty. Specifically, with regard to the second jury panel,[7] Mrs. Battle, Juror Number 609, stated that, "I don't feel like I could give the death penalty." Resp.Exh. A, Vol. I, p. 244. Based on that statement, the state moved to strike Ms. Battle for cause. Similarly, Ms. Mathis, Juror Number 861, stated that she was incapable of voting for the death penalty. Resp.Exh. A, Vol. I, p. 245. The state also moved to strike Ms. Mathis for cause.
From the third jury panel, the state moved to strike Ms. McDaniels, Juror Number 697, for cause. She expressly stated that she did not believe in the death penalty and that even a jury "should not take another person's life." Resp.Exh. A, Vol. II, pp. 337-38. From the fourth panel, the state moved to strike for cause Mr. Rosenkranz, Juror Number 908. He stated that "[t]he death penalty would be an extremely hard problem for me," and that he did not think he could impose it. Resp.Exh. A, Vol. II, p. 445.
With respect to the fifth jury panel, when asked whether under certain circumstances the death penalty might be appropriate, Mr. Stanley, Juror Number 933, responded "no." Resp.Exh. A, Vol. II, p. 518. Also, Ms. Smith, Juror No. 738, a Jehovah Witness, indicated that she did not believe in the death penalty and that her religious beliefs precluded her from judging other people. Resp.Exh. A, Vol. II, p. 538.
Finally, from the sixth jury panel, the state struck Ms. Leighton, Juror Number 689, based on her statement that "My personal opinion is I feel uncomfortable [sic] with it. I don't feel that I have the right to decide whether or not someone's life is to end." Resp.Exh. A, Vol. II, p. 580-81. Similarly, the state struck Ms. Louis, Juror Number 851, based on her statement that "I could not consider the death penalty." Resp.Exh. A, Vol. II, p. 597. Next, the state struck Mr. Smith, Juror Number 740. Mr. Smith stated that he could "never go for the [death penalty, because] it is too easy a way out." Resp. Exh. A, Vol. II, p. 595. Finally, Mr. Stubblefield, Juror Number 747, was also struck by the state for cause. Resp.Exh. A, Vol. II, p. 640. When asked whether the death penalty can be a fair punishment in some cases, Mr. Stubblefield said that he did not think so.
Based upon this Court's review of the transcript, the Court finds that each of the strikes for cause based on the proposed jurors' representations that they could not impose the death penalty were not in contravention of petitioner's constitutional rights. The jury ultimately selected would be instructed *1325 on the circumstances under which the death penalty might be imposed. Those jurors struck for cause indicated an inability or unwillingness to even consider those instructions. Thus this Court holds that they could not adequately and fully perform their duties as jurors. Consequently, the strikes for cause were appropriate.
In Claim Four under this ground, petitioner alleges that the trial court denied him a fair trial by preventing him from examining prospective jurors as to their "opinions and feelings as to why they believed in the death penalty and under what circumstances they would deem it appropriate." Amended petition, p. 61. Petitioner first presented Claim Four in his motion for a new trial, Resp.Exh. B, p. 66, then in his 29.15 motion, Resp.Exh. D, pp. 102-03, and finally on direct appeal. Resp.Exh. E, p. 102.
Petitioner fails to provide any factual or legal support for this claim. Petitioner also failed to provide the state courts with any support for this claim. See, e.g., Powell, 798 S.W.2d at 716. Further, as indicated above, the trial court is afforded wide latitude in conducting voir dire. See, e.g., Mu'Min, 500 U.S. at 422, 111 S.Ct. at 1903-04. In this case, where petitioner makes no showing that the jury which convicted him was biased, the Court is not persuaded that his constitutional rights were in any way impaired by the jury selection process. Cf. Ross v. Oklahoma, 487 U.S. 81, 86, 108 S.Ct. 2273, 2277, 101 L.Ed.2d 80 (1988). Therefore, the Court finds this claim to be without merit, and all relief based on Claim Four of Ground XII will be denied.
In his next claim under this ground, petitioner alleges that he was denied a fair trial because the trial court failed to strike Juror Number 643, Harold D. Geising, after he "emphatically stated that he wanted to impose the death penalty upon defendant." Amended Petition, p. 62. This claim was asserted in petitioner's motion for a new trial, Resp.Exh. B, p. 72, in his 29.15 motion, Resp.Exh. D, p. 104, and on direct appeal. Resp.Exh. E, p. 104.
"[T]he proper standard for determining when a prospective juror may be excused for cause because of his or her views on capital punishment ... is whether the juror's views would `prevent or substantially impair the performance of his or her duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. at 424, 105 S.Ct. at 852. It is undisputed that the Sixth and Fourteenth Amendments guarantee a criminal defendant on trial for his life the right to an impartial jury. Id.; Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961).
In this case, Mr. Geising, Juror Number 643, indicated to petitioner's trial counsel that he believed the purpose of the death penalty was to "protect society," and that if the state proved the defendant guilty, he would view it his responsibility to impose the death penalty. Resp.Exh. A, Vol. I, pp. 373-74. However, Mr. Geising also stated that he did not believe that death was the proper penalty in every case of premeditated murder. Resp.Exh. A, Vol. I, p. 388. He indicated that he would consider both sides of the case, balancing any mitigating circumstance against those aggravating circumstances proven by the prosecution, before deciding to impose the death penalty. Resp. Exh. A, Vol. I, p. 388.
The totality of Mr. Geising's testimony fails to indicate that he was unable to follow the law, as given to him in the instructions, and perform his duties as a juror. The trial court acknowledged the potential "disqualifying nature" of Mr. Geising's comments, but concluded, as does this Court, that there was "no justification for excusing him for cause." Resp.Exh. A, Vol. I, pp. 405-06. This Court is compelled to defer to that conclusion of the trial court, especially in light of the support provided for that conclusion in the transcript of the proceedings. Wainwright, 469 U.S. at pp. 425-26, 105 S.Ct. at 852-53. For these reasons, the Court finds this claim under Ground XII to be without merit and no relief will be afforded petitioner on the basis of this claim.
In his sixth claim under this ground, petitioner alleges that the trial court erred in "refusing to strike for cause certain jurors who expected petitioner to testify and to beg for his life." Amended Petition, p. 64. Specifically, *1326 petitioner alleges that the trial court should have struck, sua sponte, Ms. Kostyshoch, Juror Number 680, Ms. Brown, Juror Number 787, and Ms. Seacoul, Juror Number 918, because these jurors allegedly indicated that they would "require defendant to give reasons why his life should be spared." Amended Petition, p. 64. Petitioner asserted this claim in his motion for a new trial, Resp.Exh. B, p. 75, in his 29.15 motion, Resp. Exh. D, pp. 107-08, and on direct appeal. Resp.Exh. E, pp. 106-08.
Ms. Kostyshoch indicated that she would expect to hear from the "defense." Resp.Exh. A, Vol. II, p. 715. She did not say that she expected to hear specifically from the defendant. Additionally, once the trial court and defendant's counsel explained to Ms. Kostyshoch that the defendant was under no obligation to offer any evidence, she indicated that she would "just have to listen to what the state has to offer. And if that's what I'm limited to, that's what I can only expect." Resp.Exh. A, Vol. II, p. 733. The trial court was satisfied with her responses and found no need to strike her. This Court affords that conclusion of the trial court significant deference, Wainwright, 469 U.S. at pp. 425-26, 105 S.Ct. at 852-53, and rejects petitioner's sixth claim with respect to Ms. Kostyshoch.
With respect to the other two jurors, Ms. Brown and Ms. Seacoul, petitioner fails to direct the Court to any specific instances in the record which might support his position. Further, the Court's independent review of the transcript fails to reveal any statements by either Ms. Brown or Ms. Seacoul which would necessitate their removal from the panel for cause.
This Court finds that none of the three jurors made any statements during voir dire which would compel the trial court, sua sponte, to remove them for cause. The trial court also found these three individuals suitable for jury service, as the trial court did not order them stricken. For the reasons stated above, and in deference to the trial judge's administration of the voir dire process, the Court finds this claim for relief under Ground XII to be without merit, and all relief based on this claim will be denied.
Finally, in claim seven, petitioner alleges that the trial court erred in not striking for cause those jurors who had been "intimately connected with violent crimes." Amended Petition, p. 65. Specifically, petitioner refers to Ms. Brown, Juror Number 787; Ms. Kostyshoch, Juror Number 680; Mr. Tracy, Juror Number 957; Ms. Overturf, Juror Number 891; and Ms. Randolph, Juror Number 713. Despite statements by each of these jurors that they could put aside their experience with violent crime and be "fair," petitioner argues that "the whole of their answers indicates an inability to be fair in the instant case." Because these jurors were not stricken, petitioner contends that the jury was "conviction prone." Amended Petition, p. 66. This claim was asserted in petitioner's motion for a new trial. Resp.Exh. B, p. 76. Petitioner also asserted this claim in his 29.15 motion, Resp.Exh. D, p. 108, and on direct appeal. Resp.Exh. E, pp. 108-09.
Ms. Brown testified that one of her uncles was murdered, Resp.Exh. A, Vol. II, p. 647, and that her husband's grandmother killed her husband's grandfather. Resp.Exh. A, Vol. II, p. 662. When asked in response to her description of each incident whether there was "anything about that particular crime that would cause you to be unable to be fair in this particular case," she said no. Resp.Exh. A, Vol. II, pp. 648 & 662. Further, Ms. Brown acknowledged that the incident involving her uncle was completely separate from the jury selection proceedings and that she would be evaluating petitioner's case solely on the evidence presented in his case. Resp.Exh. A, Vol. II, p. 648. The trial court apparently found nothing in her testimony which required that she be stricken for cause. Similarly, this Court finds no basis for concluding that the trial court erred in not striking Ms. Brown for cause.
Ms. Kostyshoch testified that one of her good friends was assaulted and that a friend of her mother's had been murdered. Resp. Exh. A, Vol. II, pp. 649 & 667. Ms. Kostyshoch stated, during voir dire examination, that neither of these incidents would impair her ability to "sit and decide this case only on the evidence." Resp.Exh. A, Vol. II, pp. 649 & *1327 667. Her testimony does not provide any basis for finding that the trial court should have stricken her for cause.
Mr. Tracy testified that in 1964 he was stabbed, that in 1968 he was burglarized, and also in 1968, he knew a fellow firefighter who was convicted of killing his wife. Resp.Exh. A, Vol. II, pp. 650, 663 & 772. Similar to the other jurors who had some experience with violent crimes, when asked whether he "could put aside [his prior experiences] and decide this case only by what you hear in this courtroom," he indicated that he could. Resp.Exh. A, Vol. II, pp. 650 & 663. Nothing in his testimony indicates that he should have been struck for cause.
Ms. Penny Overturf testified that she was attacked in December 1987. Resp.Exh. A, Vol. II, p. 655. At the time of petitioner's trial, Ms. Overturf was still waiting for the person who attacked her to go to trial. Initially, when asked if there was "anything about that attack that would cause you to be unable to be fair in this case," she responded that she "wouldn't know how I would react from it." Resp.Exh. A, Vol. II, p. 656. However, after a more detailed examination, Ms. Overturf stated that she knew that petitioner was not involved with the attack against her. Further, Ms. Overturf stated that she could set aside her prior experiences and consider only the evidence she heard in petitioner's case. Resp.Exh. A, Vol. II, p. 656. Ms. Overturf's testimony convinces this Court that there was no basis for finding that the trial court should have struck Ms. Overturf for cause sua sponte.
Finally, Ms. Randolph testified that her sister had been robbed at gunpoint and shot. Resp.Exh. A, Vol. II, p. 773. In response to questioning by petitioner's trial counsel, Ms. Randolph stated that she could "set those occurrences aside." Therefore, this Court finds nothing in Ms. Randolph's testimony which would have required the trial court to sua sponte strike her for cause.
With respect to the five jurors who testified about some experience involving a violent crime, petitioner simply fails to point to anything in the record to support his assertion that "the whole of their answers[, offered in response to questions about those incidents,] indicates an inability to be fair in the instant case." To the contrary, the testimony of each of these five prospective jurors indicates their acknowledgment of the need to set aside their prior experiences and consider petitioner's case solely based on the evidence presented at trial. The Court finds this claim under ground XII to be without merit and all relief based on this claim will be denied.
Accordingly, in accordance with the foregoing memorandum, the Court finds all grounds of petitioner's amended petition to be without merit. Consequently, all relief based on those grounds asserted in the amended petition will be denied.

JUDGMENT
Pursuant to the memorandum and order entered herein this day,
IT IS HEREBY ORDERED, ADJUDGED and DECREED that the amended petition for writ of habeas corpus pursuant to 28 U.S.C.  2254 is denied.
IT IS FURTHER ORDERED that petitioner is hereby granted a certificate of probable cause to appeal.
IT IS FURTHER ORDERED that any prior order of this Court, to the extent that it stays the execution of the death penalty on petitioner, is hereby vacated and replaced by the next following order.
IT IS FURTHER ORDERED that the execution of the death penalty on petitioner Reginald L. Powell is hereby stayed for a period of thirty (30) days from the date of this judgment. Petitioner must obtain any further stay of execution from the United States Court of Appeals for the Eighth Circuit, the United States Supreme Court, or a Missouri state court.
IT IS FURTHER ORDERED that the Clerk of this Court shall give immediate notice of this judgment, both by telephone and by the mailing of a copy thereof, to: Michael S. Bowersox, the warden of the Potosi Correctional Center at Mineral Point, Missouri; Jeremiah ("Jay") Nixon, Attorney General of the State of Missouri; Mel Carnahan, Governor *1328 of the State of Missouri; and the Missouri Supreme Court.
NOTES
[1] Effective August 1, 1995, Michael S. Bowersox replaced Paul K. Delo as superintendent of the Potosi Correctional Center. Accordingly, pursuant to Fed.R.Civ.P. 25(d)(1), Mr. Bowersox is substituted for Mr. Delo, as the proper party.
[2] The record indicates that only the murder charges were tried at this time. The disposition of the other charges, which were severed, is not reflected in the current record. See Resp.Exh. A, p. 3. However, those charges are not relevant to these proceedings.
[3] The Missouri Supreme Court noted that "[t]he pro se motion and the amended motion to vacate judgment and sentence in this case constitute gross abuse of the rules governing post-conviction proceedings." State v. Powell, 798 S.W.2d 709, 717 (Mo. banc 1990). The Missouri Supreme Court found that the pro se motion was actually prepared by defendant's trial attorney, who essentially converted the errors asserted in the motion for a new trial into ineffective assistance of counsel claims. Id. Defendant's trial counsel admitted that she drafted even those grounds asserting that her representation of defendant at trial was ineffective. Id.
[4] Adams is merely an application of Caldwell by the Eleventh Circuit.
[5] Since the filing of the amended petition, Canon 3C has been amended three times. However, even if the Court were to consider those amendments, the result would be the same.
[6] In Burks, the Supreme Court held that a defendant may not be retried if he obtains reversal of his conviction on the ground that the evidence was insufficient to convict. Burks, 437 U.S. at 15-16, 98 S.Ct. at 2149-50.
[7] The trial court created six "jury panels," each consisting of approximately twelve jurors, solely for the purpose of death-qualifying the jury. Two prospective jurors were struck from the first jury panel for reasons unrelated to their beliefs about the death penalty.